IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KENNETH LINCOLN

        Plaintiff,

v.                                                                                              CV 18-652 MV/LF

STATE FARM FIRE AND
CASUALTY INSURANCE CO.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant State Farm's Motion for Summary Judgment on Claims of Violations of the Unfair Insurance Practices Act, §59A-16-20 NMSA 1997 ("MSJ on UIPA Claim") [Doc. 78], Defendant State Farm's Motion for Summary Judgment on Claims of Bad Faith ("MSJ on Bad Faith Claim") [Doc. 79], and Plaintiff's Motion to Strike Exhibits to Motion for Summary Judgment ("Motion to Strike") [Doc. 83].   The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the MSJ on UIPA Claim and MSJ on Bad Faith Claim are well-taken and will be granted and the Motion to Strike will be found as moot.

## BACKGROUND

The undisputed facts material to the instant motions are as follows.[1]   On February 6, 2016, Plaintiff Kenneth Lincoln's home in Santa Fe, New Mexico was damaged as a result of a house fire.   Doc. 1-2 ¶2.   At the time of the fire, Plaintiff carried a homeowner insurance

---

[1] The Court has not included extraneous detail, party arguments, and "facts" presented with no evidentiary support in the record.

1

policy (the "Policy") with Defendant State Farm Fire and Casualty Insurance Company ("State Farm"). *Id.* ¶ 3. The coverage limit for Plaintiff's dwelling was $533,644. Under the terms of the Policy, Plaintiff had certain "duties" that obtained after "a loss" to which the Policy applied, including providing Defendant, "as often as [it] "reasonably require[d]," any requested "records and documents, and "submitting to Defendant, "within 60 days after the loss," Plaintiff's "signed, sworn proof of loss which sets forth, to the best of [his] knowledge and belief, . . . specifications of any damaged building and detailed estimates for repair of the damage." Doc. 79-3.

As a result of the fire, Plaintiff made a claim for benefits under the Policy. Doc. 1-2 ¶ 4. On March 17, 2016, Mike Martinez, a "Claims Specialist" for Defendant, sent Plaintiff a letter indicating that Defendant was "currently working on an estimate for the cost of repairs" to Plaintiff's home. Doc. 79-5. The letter advised Plaintiff that, if he wished for Defendant "to consider a contractor's estimate due to differences in either the price or scope of damages," to "submit the contractor's estimate" to Defendant "prior to starting repairs." *Id.* The letter specified that the "contractor's estimate will need to provide a room by room breakdown of materials and labor," and that Defendant "may request to co-inspect with the contractor." *Id.*

On May 12, 2016, Melissa Johnson, a "Team Manager" for Defendant, sent Plaintiff a letter enclosing payment of $344,081.61 based upon an estimate provided by Rockefeller's Construction Inc. ("Rockefeller") "for the repairs to [Plaintiff's] home." Doc. 79-5. The letter notes that "[t]his payment represents the undisputed amount known by State Farm and is not a release of liability." *Id.* The letter further notes that Plaintiff's general contractor "expressed concerns" with "the rebuild estimate provided by Rockefeller," but that Plaintiff had not provided Defendant with "an estimate from [Plaintiff's contractor] to identify areas of

differences in the estimate[s]." *Id.* Per Plaintiff's request, the letter stated, Johnson would mail a copy of the Rockefeller estimate to Plaintiff's contractor. *Id.* Finally, the letter noted that Rockefeller would "be available to meet with" Plaintiff's general contractor "to review any scope and/or pricing concerns." *Id.*

In a letter to Campbell on March 14, 2017, Plaintiff, through his previous counsel, provided a reconstruction estimate prepared by Plaintiff's contractors indicating that the cost of reconstruction would be $625,000, which exceeds the policy limits of $533,644. Doc. 86-1. The letter noted that this estimate "was prepared by actual homebuilders," while Defendant's estimate in response was from Rockefeller, "an estimating company that was not prepared to perform the rebuilding" for Plaintiff. *Id.*

Thereafter, on August 28, 2017, Plaintiff, through his previous counsel, sent a letter to Ron Trujillo, a "Claim Specialist" for Defendant, indicating that Plaintiff had consulted with additional contractors, and attaching rebuilding estimates prepared by Sarcon Construction and Ortega Concepts. *Id.* The letter notes that the bid from Sarcon is in the amount of $607,646.79. *Id.* The letter states that Plaintiff has "now provided [Defendant] with three rebuilding estimates by licensed New Mexico contractors, all of which exceed the available coverage for rebuilding [Plaintiff's] home by a wide margin," while Defendant "has provided only an estimate from Rockefeller, a company neither willing nor able to rebuild [Plaintiff's home]." *Id.* The letter concludes that Defendant "has failed to provide any reputable documentation that rebuilding [Plaintiff's] home will cost less than [his] policy limits." *Id.*

A letter dated December 4, 2017 from Johnson to Plaintiff's previous counsel notes that, under the terms of the Policy, Plaintiff is required "to provide estimates of the damage." *Id.* Johnson states that although Defendant "requested copies of [Plaintiff's] general contractor's

3

estimate multiple times," Plaintiff did not provide such estimate until July 21, 2016, five months after the fire damage to Plaintiff's home.  *Id.*   In response to Plaintiff's prior counsel's comments about Rockefeller, Johnson writes that Defendant has "no evidence that [Rockefeller] is unwilling or unable to rebuild Dr. Lincoln's home."  *Id.*   Further, she writes that, while Defendant feels "comfortable that the estimate amount of $378,000 is accurate," she "advised Dr. Lincoln to let [Defendant] know once the repairs started and if there was hidden damage [Defendant] would reinspect to determine if it was related to the fire and issue a supplement if necessary."  *Id.*

Johnson's letter also addresses the "three rebuild estimates" provided by Plaintiff.  *Id.*  With regard to the first estimate, Johnson explains that it was "thoroughly reviewed on September 21, 2016" by Defendant's representatives along with Plaintiff's contractors "on a joint conference call," and that, after "a line by line review," "additional items" were added to the original Rockefeller estimate, and a "supplement" was issued.  *Id.*   As for the other two estimates, Johnson notes the inclusion of items that were "non-covered" repairs.  *Id.*

Johnson goes on to state that, "[i]n order to determine whether any amounts of the other two estimates submitted are covered we need a breakdown and complete copy of the sub bids which State farm has requested multiple times in accordance with the [terms of the Policy]." *Id.*   Johnson notes that "State Farm and Rockefeller[] both provided line item entr[ies] that show the specific measurement and price," and that Defendant needed "to make sure that the amounts being charged are for the similar items and measurements of what was damaged."  *Id.*  Thus, Johnson explained, "[i]n order to properly reconcile the Sarcon Construction estimate we need the sub-contractor bids that show specifically what the lump sum amount includes.   This will ensure that the bid quoted is based on the type and quality of materials that were damaged in

4

the fire loss." *Id.* Finally, Johnson's letter indicates that a total of $407,614.39 had been paid to date for the fire damage to Plaintiff's home. *Id.*

In two further letters to Plaintiff's current counsel, one signed by Johnson and another by Trujillo sent on April 27, 2018 and June 11, 2018, respectively, Defendant again advised Plaintiff that, in order for Defendant to "reconcile" Plaintiff's construction estimate, Defendant needed "a complete estimate outlining each line item unit cost, measurement, and the individual sub bids that specif[y] the unit costs and measurements." Doc. 78-5. The letters refer Plaintiff to his obligations under the Policy, and note that "[u]ntil Dr. Lincoln fulfills his conditions and duties after a loss, by providing a detailed estimate and sub bids as requested, we are unable to further consider amounts that are not substantiated." *Id.*

At his deposition, Trujillo testified that the purpose of requesting information regarding the Sarcon bid was so that Defendant could "diligently try to evaluate all that is owed [to Plaintiff] and pay what [Defendant] owe[s]"; "so that [Defendant] could evaluate it and move towards a resolution." Doc. 79-2 at 55-56. Trujillo further testified that Defendant did not receive the information requested regarding the Sarcon bid prior to Plaintiff's filing of the instant lawsuit. *Id.*

During his deposition, Plaintiff testified that he believes that Defendant owes him "the difference" between the amount that Defendant has paid him and the policy limit of $533,644. Doc. 79-1 at 112. According to Plaintiff, because the house was beyond repair and, as a result, he "was tearing [it] down . . . and rebuilding it," he did not have to provide estimates to Defendant. *Id.* at 93. When asked whether Defendant denied any part of his claim, Plaintiff responded, "No, they just delayed." Doc. 78-1 at 127. When asked whether it was his position that Defendant did not promptly investigate his claim, Plaintiff testified, "No, it's not."

5

*Id.* at 126. During his deposition, Plaintiff was unable to identify any facts, or any provision of the Policy, that Defendant misrepresented to him. *Id.* at 124.

Plaintiff commenced the instant action in New Mexico state court on May 30, 2018. The sparse "First Amended Complaint for Breach of Insurance Contract, Unfair Claims Practices and Bad Faith" is comprised of eight, one-sentence paragraphs in which Plaintiff asserts in conclusory fashion that, in partially honoring and partially rejecting Plaintiff's claim for coverage benefits under his insurance policy, Defendant "intentionally breached its contract with Plaintiff by failing to honor its policy commitments," "violated the Unfair Claims Practices Act," and "acted in bad faith by failing to timely settle and pay a first party claim." Doc. 1-2. On July 9, 2018, Defendant removed the action to this Court.

On the instant motions, Defendant seeks summary judgment on two of what appear to be three claims alleged by Plaintiff in his First Amended Complaint, namely, a claim for breach of the common law duty of bad faith and a claim for violation of the New Mexico Unfair Insurance Practices Act ("UIPA"). Plaintiff opposes Defendant's request for summary judgment on those claims and further moves to strike certain exhibits submitted by Defendant in support of its motions.

## STANDARD

The court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party need not "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rather, "the burden on the moving party may be discharged by 'showing' – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.*;

*see also Sports Unltd., Inc., v. Lankford Enter., Inc.*, 275 F.3d 996, 999 (10th Cir. 2002) (Although "[t]he burden of showing that no genuine issue of material fact exists is borne by the moving party," when "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden by pointing to a lack of evidence for the nonmovant on an essential element of the nonmovant's claim").   Once the moving party has met this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."   *Id.* at 324.   In making this showing, the nonmoving party may not rely on "the mere pleadings themselves."   *Id.*

For purposes of Rule 56(a), a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).   "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim."   *Id.* (citation omitted).   In other words, "[t]he question . . . is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   *Id.* (citation omitted).   On summary judgment, the court "construe[s] the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party."   *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005).

## DISCUSSION

I.   Plaintiff's Motion to Strike

As an initial matter, in his Motion to Strike, Plaintiff seeks to exclude from the record Defendant's Exhibit D, which Plaintiff describes as "an internal memo summary account of a phone conversation involving several individuals." Doc. 83 at 1.   Additionally, Plaintiff takes

7

issue with the May 12, 2016 letter from Johnson to Plaintiff, marked as Exhibit E, to the extent that the letter indicates that it encloses documents which, according to Plaintiff, he never received. *Id.* at 3. In reaching its determination on the merits of Defendant's motions for summary judgment, however, the Court has not considered either Exhibit D or the fact that the letter marked as Exhibit E notes the enclosure of other documents. Accordingly, Plaintiff's Motion to Strike is moot.

II.     Defendant's MSJ on Plaintiff's Bad Faith Claim

In the Complaint, Plaintiff summarily alleges that "Defendant has acted in bad faith by failing to timely settle and pay a first party claim." Doc. 1-2 ¶ 7. "The obligation to deal fairly and honestly rests equally upon the insurer and the insured." *Hauff v. Petterson*, 755 F. Supp. 2d 1138, 1145 (D.N.M. 2010) (quoting *Modiestte v. Found. Reserve Ins. Co.*, 427 P.2d 21, 25 (N.M. 1967)). In order to overcome summary judgment on his claim that Defendant violated this obligation by acting in bad faith, Plaintiff "must cite evidence tending to show that [Defendant]'s actions were based on a 'dishonest judgment' and that it 'failed to honestly and fairly balance its own interests' with [Plaintiff]'s." *Id.* (quoting *Sloan v. State Farm Mut. Auto. Ins. Co.*, 85 P.3d 230, 237 (N.M. 2004)).

"[A]n insurer who fails to pay a first-party claim has acted in bad faith where its reasons for denying or delaying payment of the claim are frivolous or unfounded." *Sloan*, 85 P.3d at 236. "'Unfounded' is defined not as 'erroneous' or 'incorrect,' but rather the failure to exercise care for the interests of the insured, an arbitrary or baseless refusal to pay, lacking support in the language of the policy or the circumstances of the claim." *American Nat. Property & Cas. Co. v. Cleveland*, 293 P.3d 954, 958 (N.M. Ct. App. 2012). Accordingly, "an insurer has a right to refuse a claim without exposure to a bad faith claim if it has reasonable grounds to deny

coverage." *Id.*   Generally, "reasonable grounds" to deny or delay coverage "flow[] from a reasonable investigation of the claim." *Id.*   Notably, "[w]here the insurer had a legitimate reason to question the amount of damages claimed by the insured, a finding of bad faith is improper." *Hauff*, 755 F. Supp. 2d at 1145 (citing *United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 709 P.2d 649, 654 (N.M. 1985)).

Here, it is undisputed that, within three months of the fire, Defendant provided Plaintiff with a payment of approximately $344,000 for the damage to his home.   Doc. 79-5.   Further, as of December 4, 2017, Defendant had paid to Plaintiff a total amount of approximately $408,000 for the damage to his home.   Doc. 86-1.   Accordingly, the record shows that Defendant has not "failed to pay a first party claim," as alleged in the Complaint.

While admitting that Defendant has not "denied" his claim, Plaintiff contends that Defendant has "delayed" paying his claim.    Plaintiff, however, has provided no evidence to support his theory that Defendant, in bad faith, failed to timely settle his claim.    In fact, the record reflects consistent efforts on the part of Defendant to "reconcile" Rockefeller's estimate with those of Plaintiff's own contractors for the purpose of evaluating "all that is owed" to Plaintiff and "mov[ing] towards a resolution."    Doc. 79-2 at 55-56.   Johnson's letter enclosing the original payment specifically noted that the amount paid represented only "the undisputed amount known by State Farm" and was not "a release of liability," and offered to have Rockefeller "meet with" Plaintiff's own general contractor "to review any scope and/or pricing concerns."   Doc. 79-5.   As to Plaintiff's rebuild estimates, Johnson's December 4, 2017 letter reflects that Defendant "thoroughly reviewed" the first estimate submitted by Plaintiff and that, after a "line by line review" with Plaintiff's contractors, "additional items" were added to the original Rockefeller estimate, and a "supplement" was issued.   Doc. 86-1.   Johnson's letter

also reflects that Defendant needed further information to determine whether Plaintiff's other two estimates, including the Sarcon bid, related to "covered" repairs.  *Id.*   Pointing to the terms of the Policy, which required Plaintiff to submit "detailed estimates for repair of the damage" to his home, Johnson's letter notes that Defendant requested, "multiple times," a "breakdown and complete copy of the sub bids" underlying those estimates.  *Id.*   Until June 2018, Defendant continued to advise Plaintiff that in order to "reconcile" Plaintiff's construction estimate, Defendant needed "a complete estimate outlining each line item unit cost, measurement, and the individual sub bids that specif[y] the unit costs and measurements."  Doc. 78-5.  Repeatedly pointing to Plaintiff's obligations under the Policy to provided "detailed estimates," Defendant made clear that it would not be able to "further consider amounts" unless those amounts were "substantiated."  *Id.*

In the face of this evidence, Plaintiff does no more than argue, without any evidentiary support, that Defendant's repeated requests for more detailed information were merely a "delay tactic" that "misstate[d]" the Policy, and were taken to avoid Defendant's obligation to Plaintiff under the Policy.  Doc. 85 at 3.  Plaintiff fails to support his contention that Defendant's repeated references to Plaintiff's obligations under the Policy were misstatements.  Indeed, during his deposition, Plaintiff was unable to identify any facts, or any provision of the Policy, that Defendant misrepresented to him.  Doc. 78-1 at 124.

According to Plaintiff, the level of detail that Defendant required would be "an absurd way to bid new construction," and Sarcon's bid "was perfectly acceptable."  Doc. 85 at 3.  The only support that Plaintiff provides for this contention is the affidavit of Rob Wing, Senior Project Manager for Sarcon, in whose opinion "[t]he Sarcon bid is totally acceptable in the Santa Fe construction community and is similar to what other qualified contractors in the Santa Fe area

10

would prepare." Doc. 86-1 ¶ 8. Further, Mr. Wing states that "it wouldn't make sense" to do a "bid by unit cost and measurements for each room." Doc. 86-1 ¶ 8. But the opinion of Mr. Wing, who does not profess to have any expertise in insurance claim investigation and processing, is insufficient to support Plaintiff's contention. *Hauff*, 755 F. Supp. 2d at 1148 (holding that it was not enough for plaintiff to rely on testimony of his expert for his description of industry standards that defendant allegedly failed to meet). "[T]he mere expression of an opinion without [factual] support is insufficient to raise a triable issue of material fact." *Id.* (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6293 (2010)). Mr. Wing cites to "no facts, studies, or data compilations to support his opinion." *Hauff*, 755 F. Supp. 2d at 1148. Accordingly, Mr. Wing's opinion is no more than argument, and as such does not constitute "facts showing that there is genuine issue for trial." *Celotex*, 477 U.S. at 999.

Essentially, Plaintiff's argument is that he is entitled to his policy limit of $533,644, and that Defendant's refusal to "settle" his claim for that amount, or even for the amount proposed by Plaintiff during mediation, is unreasonable. *See, e.g.*, Doc. 85 at 6-7 ("Even after suit was filed[, Defendant] offered a measly $20,000, which doesn't come close to the policy limits."). Aside from submitting Mr. Wing's affidavit, which, as discussed above, is not evidence, Plaintiff provides nothing to substantiate his position that Defendant's assessment of Plaintiff's claim was unreasonably low. "That [Plaintiff] found the offer to be low, in itself, does not make [Defendant]'s offer unreasonable or the product of bad faith." *Hauff*, 755 F. Supp. 2d at 1147. There is nothing in the record that "suggests that the amount was a product of bad faith." *Id.*

Plaintiff argues that summary judgment is improper because, as Defendant admits, there remains "a dispute over the value of the claim." Doc. 85 at 6. This argument misses the mark,

however, as Plaintiff's bad faith claim turns not on the value of Plaintiff's claim – or even whether Defendant incorrectly assessed the value of claim – but rather on whether Defendant had a legitimate reason to question Plaintiff's valuation of his claim. Accordingly, in order to overcome summary judgment on his bad faith claim, Plaintiff is required to cite evidence tending to show that Defendant's refusal to pay further amounts in connection with the fire damage to Plaintiff's home, without first receiving more detailed estimates from Plaintiff's contractors, was "frivolous or unfounded," *i.e.*, arbitrary or baseless, and lacking support in the language of the Policy. Plaintiff fails to meet this burden. Defendant thus is entitled to summary judgment on Plaintiff's bad faith claim.

III.    <u>Defendant's MSJ on Plaintiff's UIPA Claim</u>

In the Complaint, Plaintiff claims that "Defendant violated the Unfair Claims Practices Act, specifically section 59A-16-20 paragraphs A, B, C, E, G, H, M and N," without alleging any conduct by Defendant that purportedly constitutes such a violation.[2] Doc. 1-2 ¶ 6. The UIPA provides that certain enumerated practices, "knowingly committed or performed with such frequency as to indicate a general business practice, are unfair and deceptive," and thus "are prohibited." N.M. Stat. Ann. § 59A-16-20. The UIPA "does not 'require insurers to settle cases they reasonably believe to be without merit or overvalued.'" *Hauff*, 755 F. Supp. 2d at 1148 (quoting *Hovet v. Allstate Ins. Co.*, 89 P.3d 69, 78 (N.M. 2004)). "Any insurer that objectively exercises good faith and fairly attempts to settle its cases on a reasonable basis and in

---

[2] In his response brief, Plaintiff cites subsection D of § 59A-16-20, and includes a one-sentence argument that Defendant "rejected Lincoln's three contractor bids, which would constitute a denial of coverage up to the policy limit, thereby violating paragraph D." Plaintiff may not, for the first time in response to a motion for summary judgment, attempt to amend his complaint to add a new allegation. *See* Fed. R. Civ. P. 15 (setting forth rules for amending a pleading). Accordingly, the Court will not consider Plaintiff's argument as it applies to § 59A-16-20(D).

a timely manner need not fear liability." *Hauff*, 755 F. Supp. 2d at 1148 (quoting *Hovet*, 89 P.3d at 78).

Subsection A of § 59A-16-20 prohibits "misrepresenting to insureds pertinent facts or policy provisions relating to coverages at issue." As Plaintiff admits, during his deposition, he was unable to identify any facts, or any provision of the Policy, that Defendant misrepresented to him. Doc. 86 at 2; Doc. 78-1 at 124. And in his response, Plaintiff does no more than argue, without any evidentiary support, that Defendant's repeated requests for more detailed information were merely a "delay tactic and misrepresentation of the [P]olicy" Doc. 86 at 4. For the reasons noted above, Mr. Wing's opinion that Defendant's requests for detailed estimates "wouldn't make sense" is not evidence that the Sarcon bid was "perfectly acceptable" under the terms of the Policy, or that Defendant misrepresented the Policy by requesting more detail than Sarcon provided in its estimate. Doc. 86-1 ¶ 8; Doc. 86 at 11.

Nor, as Plaintiff contends, is Johnson's April 27, 2018 letter a "perfect example" of Defendant's misrepresentation of the Policy. *Id.* at 4. According to Plaintiff, although the Policy does not require that a computer program called Xactimate be used to calculate an estimate, Johnson's letter "pretends" that Sarcon's estimate "is unreliable" because Sarcon did not use Xactimate to create its bid. *Id.* Nowhere, however, does Johnson's letter state that Sarcon's bid was "unreliable" in the first instance, much less that its unreliability resulted from Sarcon's failure to use Xactimate in calculating it. Rather, Johnson notes that Rockefeller used Xactimate in calculating its bid, and advises that, in order to reconcile the Sarcon estimate with that of Rockefeller, Defendant needed "a complete estimate outlining each line item unit cost, measurement, and the individual sub bids that specif[y] the unit costs and measurements." Doc. 78-5. Accordingly, Johnson's letter does not misrepresent the Policy's requirements.

13

Similarly, the Court cannot agree that Johnson's December 4, 2017 letter contains an "egregious" example of Defendant's misrepresentations of the Policy. Doc. 86 at 10. In that letter, Johnson wrote that the "North Wing also referred to as the office or casita was not structurally compromised as a result of the fire to the main structure. The North Wing is included in Dr. Lincoln's total Coverage A limits of $533.644 and didn't require total replacement due to fire damage." Doc. 86-1. From this language, Plaintiff gleans that Johnson was conveying that "the hypothetical cost to rebuild [the casita] (whatever that is) will have to be deducted from the limit of $544,644 on the principal dwelling, thereby reducing the amount of money available to pay this claim." Doc. 86 at 10. Admittedly, this language is confusing in that it appears, perhaps mistakenly, to indicate that, for purposes of the $544,644 policy limit, Plaintiff's home includes the casita. This, however, is of no moment, as it is undisputed that there was no damage to the casita, and thus that no amount was deducted, or intended to be deducted, from Plaintiff's policy limit in connection with the casita.

Further, Plaintiff fails to support his argument that Defendant misrepresented "pertinent facts or policy provisions" because its "stated policy is [] not the same as how [it] handled this claim." Doc. 86 at 5. Contrary to Plaintiff's contention that Defendant "completely ignored" Plaintiff's three estimates, *id.*, as discussed in detail above, the record demonstrates consistent efforts on the part of Defendant to "reconcile" Rockefeller's estimate with those of Plaintiff's own contractors for the purpose of evaluating "all that is owed" to Plaintiff and "mov[ing] towards a resolution." Doc. 79-2 at 55-56. Nor has Plaintiff provided any support for his claim that the Rockefeller estimate "was not an actual bid to rebuild the house" for the stated amount. Doc. 86 at 5. Again, Mr. Wing's opinion as to whether the house could be rebuilt for that amount is not evidence. Moreover, Plaintiff himself cites to an excerpt of the deposition of

14

a Rockefeller representative that belies Plaintiff's claim that Rockefeller "is not in the business of building houses from the ground up." Doc. 86 at 7. Specifically, when asked whether he would not have "references of houses [he] built from the ground up because that's not really what [he does]," Cole Borgeson responded, "we do build houses from the ground up that are related to an insurance claim." Doc. 86 at 7. Because Plaintiff thus fails to provide evidentiary support for his claim that "[t]here were significant misrepresentations of the [P]olicy provisions," *id.* at 14, Plaintiff equally fails to show a genuine issue for trial as to Defendant's alleged violation of § 59A-16-20(A).

Next, Section B of § 59A-16-20 prohibits "failing to acknowledge and act reasonably promptly upon communications with respect to claims from insured arising under policies." In his response, Plaintiff addresses this provision with no more than the following sentence: "As to paragraph B, State Farm acted promptly at first and paid the personal property claim. But once they saw how much it would really cost to build a new house, they became increasingly argumentative." Doc. 86 at 14. This unsupported statement is argument, not evidence, and is contrary to the undisputed evidence. First, when asked at his deposition whether it was his position that Defendant did not promptly investigate his claim, Plaintiff testified, "No, it's not." Doc. 78-1 at 126. Further, beginning approximately one month after the fire, Defendant communicated with Plaintiff, initially with a letter indicating that Defendant was "currently working on an estimate for the cost of repairs" to Plaintiff's home, followed a month later with a letter enclosing the initial payment of $344,081.61 and thereafter with several additional letters repeatedly requesting additional information in order to reconcile Plaintiff's estimates with its own. *See* Doc. 79-5. Conspicuously absent from the correspondence between the parties is any indication that Defendant failed to acknowledge or act reasonably promptly on Plaintiff's

15

communications. Failing to adduce such evidence, Plaintiff equally fails to show a genuine issue for trial as to Defendant's alleged violation of § 59A-16-20(B).

Section E of § 59A-16-20 prohibits "not attempting in good faith to effectuate prompt, fair and equitable settlements of an insured's claims in which liability has become reasonably clear." Section H of § 59A-16-20 prohibits "attempting to settle a claim by an insured for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application." As to these provisions, Plaintiff's response states that these paragraphs "are similar," and argues that Defendant violated them both because it "made no offer to settle prior to filing suit." Doc. 86 at 14. This generalized argument, without more, is insufficient to overcome summary judgment. Plaintiff has provided no proof that Defendant did not attempt in good faith to effectuate "a prompt, fair, and equitable" settlement of his claim, that Defendant's liability – above and beyond that which it has already paid – has become "reasonably clear," or that the amounts already paid to Plaintiff on his claim are "less than the amount to which a reasonable person would have believed he was entitled by reference" to the Policy. Indeed, as detailed (repeatedly) above, Defendant never refused to pay Plaintiff amounts in addition to the approximately $408,000 it paid to him for the damage to his home, but rather made repeated and consistent efforts to "reconcile" its estimate of the rebuild with those of Plaintiff's own contractors, asking in the process for detailed estimates in accordance with the Policy. As with Plaintiff's bad faith claim, the crux of Plaintiff's argument here is that Defendant refused to settle for the full amount of Plaintiff's limit under the Policy or for the amount proposed by Plaintiff during mediation. But again, Plaintiff has failed to substantiate his position that Defendant's assessment of Plaintiff's claim was unreasonably low, based on the Policy or otherwise.

Without such a showing, Plaintiff fails to establish a genuine issue for trial as to whether Defendant violated § 59A-16-20(E) and (H).  *See Hauff*, 755 F. Supp. 2d at 1148 (nothing that the UIPA does not require insurers to settle cases they reasonably believe to be overvalued).

Section G of § 59A-16-20 prohibits "compelling insureds to institute litigation to recover amounts due under policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds when such insureds have made claims for amounts reasonably similar to amounts ultimately recovered."  As to this provision, Plaintiff's response states only that "had Lincoln not filed suit, the claim would still be in limbo and not resolved.  Whether or not Lincoln receives a substantial award in damages remains to be seen."  Doc. 86 at 14. Plaintiff "provides no proof that unreasonably low settlement offers compelled him to litigate." *Hauff*, 755 F. Supp. 2d at 1148.  Nor has Plaintiff submitted any evidence that Defendant offered him "substantially less than similar claimants recover."  *Id.* at 1149.  Indeed, the record is replete with evidence of Defendant's willingness to consider payments in addition to those already made to Plaintiff on his claim.  In contrast, it appears that Plaintiff consistently refused to provide the detailed estimates requested by Defendant, instead taking the position that he was owed the full amount of Policy limit and was not required to provide the requested estimates in order to obtain that amount.  *See* Doc. 79-1 at 112, 127.  In the absence of evidence that Defendant offered Plaintiff substantially less than amounts ultimately recovered by other insureds with similar claims, Plaintiff fails to show the existence of a genuine issue as to whether Defendant violated § 59A-16-20(G).

Section C of § 59A-16-20 prohibits "failing to adopt and implement reasonable standards for the prompt investigation and processing of insureds' claims arising under policies."  Section M of § 59A-16-20 prohibits "failing to settle an insured's claims promptly where liability has

become apparent under one portion of the policy coverage in order to influence settlement under other portions of the policy coverage." Section N of § 59A-16-20 prohibits "failing to promptly provide an insured a reasonable explanation of the basis relied on in the policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." In his response, Plaintiff makes no mention of these provisions and provides no evidence to substantiate the allegation in the Complaint that Defendant violated these provisions. The Court construes Plaintiff's failure to respond to Defendant's motion as it relates to Sections C, M, and N as consent to the Court's granting of summary judgment. D.N.M. LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion."). Because Plaintiff fails to adduce any evidence of Defendant's alleged violation of § 59A-16-20(C), (M), or (N), no genuine issue exists as to whether Defendant violated these provisions.

IV.     Plaintiff's Remaining Claim

In the Complaint, Plaintiff claims that "Defendant intentionally breached its contract with Plaintiff by failing to honor its policy commitments." Doc. 1-2 ¶ 5. The sole factual allegation (conclusory though it might be) to support this claim is that "Plaintiff made a claim for coverage benefits under his insurance policy. Said claim was partially honored and partially rejected." *Id.* ¶ 4. This is the same factual allegation from which Plaintiff's bad faith and UIPA claims arise. *See id.* ¶¶ 4-7. The material facts relevant to this allegation appear to be undisputed and now before the Court on the record submitted in connection with Defendant's MSJ on Bad Faith Claim and MSJ on UIPA Claim. Accordingly, the Court hereby gives notice that, pursuant to Rule 56(f)(3) of the Federal Rules of Civil Procedure, it may consider summary judgment on Plaintiff's breach of contract claim. Before so considering, the Court will give the

parties an opportunity to file memoranda of law addressing whether summary judgment as to Plaintiff's breach of contract claim should be entered.

## CONCLUSION

Plaintiff has failed to show that there is a genuine issue for trial on his bad faith claim and on his UIPA claim. Accordingly, summary judgment in favor of Defendant is proper on those claims. In reaching this decision, the Court has not considered the exhibits to which Plaintiff objects and thus Plaintiff's objection to those exhibits is moot. After giving the parties an opportunity to respond, the Court may consider whether summary judgment is proper on Plaintiff's breach of contract claim.

**IT IS THEREFORE ORDERED** that:

(1) Defendant State Farm's Motion for Summary Judgment on Claims of Violations of the Unfair Insurance Practices Act, §59A-16-20 NMSA 1997 [Doc. 78] is **GRANTED** as follows: Plaintiff's claim that Defendant violated the Unfair Claims Practices Act is dismissed with prejudice;

(2) Defendant State Farm's Motion for Summary Judgment on Claims of Bad Faith [Doc. 79] is **GRANTED** as follows: Plaintiff's claim that Defendant acted in bad faith is dismissed with prejudice;

(3) Plaintiff's Motion to Strike Exhibits to Motion for Summary Judgment [Doc. 83] is **FOUND AS MOOT**; and

(4)     Pursuant to Rule 56(f)(3) of the Federal Rules of Civil Procedure, the parties may file memoranda of law no later than October 21, 2020 addressing whether the Court should grant summary judgment on Plaintiff's claim for breach of contract.

DATED this 30th day of September 2020.

_____
MARTHA VAZQUEZ
United States District Judge